Fred ANGEL, Petitioner-Appellee,

v.

Roger OVERBERG, Supt., Respondent-Appellant.

No. 80–3546.

United States Court of Appeals, Sixth Circuit.

Submitted on Briefs April 26, 1982.

Decided July 16, 1982.

William J. Brown, Atty. Gen. of Ohio, Dain N. DeVeny, David E. Stocker, Asst. Attys. Gen., Columbus, Ohio, for respondent-appellant.

Michael A. Marrero, Cincinnati, Ohio, court appointed, for petitioner-appellee.

Before EDWARDS, Chief Judge, LIVELY, ENGEL, KEITH, MERRITT, KENNEDY, MARTIN, JONES, CONTIE and KRUPANSKY, Circuit Judges, and BROWN,* Senior Circuit Judge.

CORNELIA G. KENNEDY, Circuit Judge.

Petitioner-Appellee, Fred Angel, was convicted in the Court of Common Pleas of Butler County, Ohio of voluntary man-

slaughter. His appeals to the state appellate courts were unsuccessful. The District Court for the Southern District of Ohio granted a writ of habeas corpus on the ground of prosecutorial misconduct during the prosecutor's rebuttal argument. The original panel decision of this Court affirmed the issuance of the writ. *Angel v. Overberg*, 664 F.2d 1052 (6th Cir. 1981). We now reverse.

The record indicates that on July 1, 1977, Fred Angel and some of his friends were patronizing the Turf Club Bar in Hamilton, Ohio. In the early hours of July 2, 1977, the decedent, James Lang, and two friends entered the bar. Petitioner and Lang exchanged angry words. Eventually, they made their way outside accompanied by the other patrons. The two men scuffled. Angel, who allegedly had received a knife wound to his left side during the scuffle, freed himself from the fight, went to the trunk of his car, and took out his gun. Lang and Angel approached each other as if to fight again whereupon the gun discharged fatally wounding Lang in the chest. The testimony differed as to the distance between the two combatants at the time of the gun's discharge. There were, however, no powder burns on the victim's skin casting doubt on Angel's claim that Lang was shot at close range. After the shooting, Angel disappeared into an alley where he discarded the murder weapon into a trash can.

After the shooting, Angel returned to the Turf Club Bar in time to speak with the police officers investigating the incident. At this time he told the police that he had been with his wife in another city at the time of the shooting. After an investigation, Angel was arrested and charged with first degree murder.

During his trial, Angel did not claim alibi as his defense. Instead, he asserted that Lang was shot in self-defense. On cross-examination, Angel admitted that his earlier

---

* Circuit Judge Brown retired from active service on June 16, 1982, and became a Senior Circuit Judge.

report to the police regarding his location at the time of the shooting had been false. Further, he admitted that he had not shown the police his alleged knife wound at the hands of Lang. A photograph of the wound, allegedly taken by Angel's sister-in-law, was admitted into evidence.

During closing argument, defense counsel engaged in a series of attacks upon the conduct of the police and the prosecutor. Defense counsel impugned the integrity of the prosecutor and the veracity of the police department, alleging the police were more interested in "winning" than in seeing justice done, and that the prosecutor coached his witnesses to tell a particular story. In response to these harsh attacks the prosecutor, in rebuttal, made three statements which formed the bases for the District Court's grant of the habeas petition. First, the prosecutor commented on the defense's election to reserve making an opening statement until the state had put on its case-in-chief, suggesting that defense counsel had waited to see the state's evidence before deciding whether to pursue a self-defense or alibi defense.[1] Second, the prosecutor referred to some of the petitioner's witnesses as "last minute witnesses," which, petitioner claims, implied personal knowledge of facts outside the record on the part of the prosecutor and suggested that defense counsel sought out these witnesses to bolster a sagging defense.[2] Finally, the prosecutor accused defense witnesses of lying, allegedly implying they had done so at the behest of defense counsel.[3]

 The proper legal standard we are to utilize in evaluating alleged misconduct by a state prosecutor is relatively clear. The prosecutor is ordinarily entitled to wide latitude in rebuttal argument and may fairly respond to arguments made by defense

---

1. The prosecutor stated:

 Another defense tactic, and I want you to bear this one closely in mind, because it has a great deal to do with the way you consider the evidence that they put on the witness stand. Mr. Bressler said this was going to be a search for the truth, but when do they say anything about self-defense. They didn't even give you a hint of that defense on voir dire. At no time had they ever said a word about self-defense. If you'll recall Mr. Bressler asked the Judge can I reserve my opening statement to the end of the State's case. Did he get up there like a man and say listen, we're going to prove it was self-defense, et cetera, et cetera—et cetera—and these words were said and those words were said. Well the reason they didn't do that is very simple, because they didn't know what their defense was going to be. You see they had a lot of options....
 But they wait until I have put on my case and then they know—uh oh, we'd better do something. We'd better say this was self-defense—
 That's when they get around to it, after they've heard and had an opportunity to sit and listen, to examine and to analyze, to have their secretaries prepare the transcripts of all the witness' testimony. That's when they start putting this together. We've got to say its self-defense....
 Tr. 668–69.

2. She said exactly what happened to the best of her recollection. The police didn't make her say any of that stuff. What she said is true and they have to sit there and admit it. But they got a big benefit from that defense tactic. They got an opportunity, as I have said, to weave their story. They heard the words that were spoken, so they're going to use the exact words and instead of saying that this man said those words, we'll make James Lang the speaker of those exact words. So who do they bring in as these last minute witnesses?
 Tr. 671.

3. And here's how *they* weave *their* story....

 \*　\*　\*　\*　\*　\*

 And she's a lady. And she spins out this story about James Lang's domestic problems; his domestic affairs, so to speak, and that brought out rage in my mind—in your mind—and should have brought outrage in anybody's mind.
 But *they* think that that's all necessary to weave this pattern, what *they're* going to claim is self-defense.

 \*　\*　\*　\*　\*　\*

 So they start out by this, "oh, now we're going to admit that he lied to the police" to you. How could they avoid it? They can't avoid it. They have to admit that he lied, along with everybody else they called.

 \*　\*　\*　\*　\*　\*

 So this little dance, this little drama about where the gun was being held, doesn't mean anything, except that *they're* trying to lie. (Emphasis supplied).
 Tr. 671–674. The fact that the prosecutor referred to "their" lies could cast doubt on the integrity of defense counsel. Defendant was represented by two attorneys.

counsel. *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). Before habeas relief is granted, the prosecutor's statements must be so egregious as to render the trial fundamentally unfair. *Id.* This determination is to be made by evaluating the totality of the circumstances surrounding each individual case. *Hayton v. Egeler*, 555 F.2d 599, 604 (6th Cir.), *cert. denied*, 434 U.S. 973, 98 S.Ct. 527, 54 L.Ed.2d 463 (1977). Our Court has identified the factors we are to consider in weighing the extent of prosecutorial misconduct in habeas cases.

> In every case, we consider the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally placed before the jury, and the strength of the competent proof to establish the guilt of the accused.

*United States v. Leon*, 534 F.2d 667, 679 (6th Cir. 1976). However, even when reviewing prosecutorial misconduct on direct appeal, this Court has remarked:

> More commonly, however, the complained-of conduct will not rise to *reversible* error, notably if it is not flagrant, where proof of guilt is overwhelming, where counsel does not object and/or where the trial judge steps in and admonishes the jury [citations omitted]. Indeed, it is notable how often courts cite improper argument by a prosecutor and how seldom they reverse convictions because of it.

*United States v. Bess*, 593 F.2d 749, 757 (6th Cir. 1979) (emphasis in original).

Given this strict standard for reversal and remembering that we do not sit as an appellate court rectifying trial errors but only to ensure fundamental fairness, we cannot say that petitioner's trial was so prejudiced by the prosecutor's misstatements that a new trial is warranted.

At the outset, it must be noted that the prosecutor's arguments at issue here were all made in rebuttal argument and in response to defense counsel's attack upon the police and prosecutor. While this, of course, does not excuse prosecutorial error, it does serve to mitigate the severity of the harm. *See Cook v. Bordenkircher*, 602 F.2d 117, 121 (6th Cir.), *cert. denied*, 444 U.S. 936, 100 S.Ct. 286, 62 L.Ed.2d 196 (1979).

■ Moreover, some of the alleged misstatements may not have been interpreted by the jury in the way petitioner chooses to characterize their effect. The reference to "last minute witnesses" did not necessarily imply that the prosecutor had knowledge of facts outside the record; rather, it could equally have implied that the witnesses did not come forward at the time of the investigation. If two plausible interpretations can be given to a prosecutor's ambiguous final argument, the court should not strive to adopt the one which casts doubt upon the prosecutor's intentions. *Cf. United States v. Trapnell*, 638 F.2d 1016, 1025 (7th Cir. 1980).

■ Finally, we remain unconvinced that the reference to defense counsels' trial tactic of reserving opening statement and the oblique allusion to some impropriety on the part of the defense team, although unbecoming and inappropriate, sufficiently affected the regularity of the trial to warrant habeas corpus relief. These errors were neither flagrant nor repeated. There was a complete absence of objection on the part of counsel for the defense although the record amply demonstrates that they knew how to object since they did so elsewhere and were sustained. Instead of objecting and giving the trial court an opportunity to correct the error by a strong instruction to the jury, defense counsel permitted the argument to proceed to its conclusion and then moved for a mistrial. This kind of calculated tactic cannot form the basis for habeas relief especially where, as here, the evidence of guilt of voluntary manslaughter is overwhelming. *See Cook v. Bordenkircher, supra*, 602 F.2d at 121.

The cases which deal with prosecutorial misconduct during closing argument form a kind of continuum upon which one can measure the gravity of the comments, keep-

ing in mind, of course, that each case must be decided upon its own facts. In *Cook, supra,* this Court noted the "extreme nature of prosecutorial misconduct required for a federal court to issue the writ." *Id.* at 120. There, the alleged misconduct involved the prosecutor's persistent and pervading attack on the petitioner's character, including, most significantly for our purposes, an attack which alleged that the petitioner was trying to "forge" and "steal" justice by "conning" the jury with a fabricated story. The prosecutor continually portrayed petitioner as a "lowlife" who had to be kept from society, exclaiming that he was worse than all of the " 'criminals' and 'traitors' in hell." *Id.* Notwithstanding what this Court characterized as the "inexcusable" conduct of the prosecutor, petitioner's conviction was upheld. In *Houston v. Estelle,* 569 F.2d 372, 383 n.14 (5th Cir. 1978), on the other hand, the prosecutor flatly asserted that the defendant, his corroborating witnesses and his friends were liars. He characterized defense counsel as hypocrites and attempted to stigmatize every defense objection. The court stated: "This is not a case of isolated aberration. This is a litany of prosecutorial anathema prejudicial to the defendant." *Id.* Because we feel this case is far closer to the prosecutorial misconduct epitomized by the *Cook* line of cases rather than the *Houston* line of cases, we reverse the judgment of the District Court and deny the writ of habeas corpus.

IT IS SO ORDERED.