902 F.2d 36
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Eric WALDON, Defendant-Appellant.
 No. 89-3935.
 United States Court of Appeals, Sixth Circuit.
 May 7, 1990.
 
 Before MERRITT, Chief Circuit Judge; BOYCE F. MARTIN, Jr., and RALPH B. GUY, Jr., Circuit Judges.
 PER CURIAM.
 
 
 1
 Defendant, Eric Waldon, was convicted by a jury of possession with intent to distribute crack cocaine. 21 U.S.C. Sec. 841(a)(1) and (b)(1)(B). On appeal, Waldon argues there was insufficient evidence to prove the elements of the offense with which he was charged. He also claims the prosecutor made an appeal to prejudice in the closing argument. Upon a review of the record, we find no merit to Waldon's arguments and will affirm.
 
 I.
 
 2
 There was little more to the trial of this case than the jury being required to choose between two different witnesses' versions of what occurred. The government witness was Detective Richard Campbell of the Cleveland, Ohio, Police Department. The defense witness was Marilyn Miller, a friend of the defendant.
 
 
 3
 Campbell testified that he was surveilling an area of known narcotics activity on February 24, 1989. He observed two black males engaging in street sales of drugs. One of the men was wearing a green ski jacket and the other a black ski coat. One would flag down motorists and the other would offer drugs for sale to the people in the cars that stopped. Campbell observed exchanges taking place. After observing this activity for some time, Campbell called for backup. He then positioned himself in a nearby alley, which he thought would be a flight route if the suspects tried to flee. Campbell had guessed right, and when the backup units arrived, the two suspects ran into the alley. As they approached Campbell, he stepped out in their view and ordered them to halt. The suspects were eight to ten feet away at this point. At this time, Campbell had a good look at the suspect in the green ski jacket, whom he later identified as Waldon, and he observed that he had a full beard. Although the suspects momentarily hesitated, they continued running. Campbell followed the man in the green jacket up a flight of stairs into an apartment building and then into an apartment. The suspect ran into a back bedroom in the apartment. Campbell, with gun drawn, ordered the suspect out of the bedroom. At that point Waldon, now wearing a green army fatigue jacket, and another male emerged. Campbell recognized Waldon as the suspect he had chased down the alley and into the apartment. Campbell then entered the bedroom and saw a woman and two small children. The woman was later identified as Marilyn Miller, the lessee of the apartment. On the floor in the bedroom was a green ski jacket, $350.00 in cash, and a plastic bag containing 42 rocks of crack cocaine.
 
 
 4
 After arresting Waldon, Campbell spoke with Marilyn Miller. According to Campbell, Miller denied knowing Waldon and said he did not have permission to enter her apartment.
 
 
 5
 Campbell testified to these events at the trial along with the government chemist who identified the crack cocaine. This was the government's case.
 
 
 6
 The principal defense witness was Marilyn Miller. Miller testified she and her two children lived in the apartment where the arrest took place. She did not work and was on welfare. Miller said she had a friend named Sean who would visit periodically, and that the green ski jacket found in the bedroom belonged to him. She also said Sean had a mustache, and that it was Sean who ran into her bedroom on the day in question.
 
 
 7
 Miller said she had met Waldon seven months earlier and that, although he lived in Michigan, he had visited her on at least seven occasions since then. She testified that Waldon and another friend, Eric Robinson, had arrived the day before, February 23, 1989, and spent the night in her apartment. According to Miller, on the morning of February 24, 1989, Waldon and Robinson were leaving when Waldon entered her bedroom and asked if she needed anything from the store. At that point in time, she heard a noise, and Sean burst into her room not wearing a jacket. Miller claims to have then run out of the bedroom and confronted Campbell who ordered her to have anyone in her bedroom come out.
 
 
 8
 Miller denied telling Campbell she did not know Waldon, and indicated she had been harassed by the police for refusing to press charges against those who broke into her apartment. On cross-examination, she admitted she had never told her version of these events to the police, even though she knew Waldon had been arrested.
 
 
 9
 Eric Robinson also testified for the defense and indicated that he was outside warming up his car when these events took place. He stated he saw the two men run down the alley and that neither of them was Waldon.
 
 
 10
 After two character witnesses testified, Waldon testified in his own behalf. He indicated he was a college senior and had known Marilyn Miller for seven months, but that she was not his girlfriend. He stated that he and Eric Robinson had spent the night of February 23, 1989, in Miller's apartment, and that the outer garment he wore on this trip was a green fatigue jacket. Waldon further indicated that on the morning of February 24, 1989, he got up, entered Ms. Miller's bedroom, and asked if she wanted something from the store. He then left the bedroom and, as he walked down the hallway, a man came running through the back door. This man ran into Marilyn's bedroom and the defendant followed. Marilyn screamed, and he heard a voice yell for them to come out. The defendant exited the bedroom wearing his green fatigue jacket. The second man exited the bedroom with no coat on. The defendant testified that he was cooperative and answered questions. He denied selling drugs or being in the alley on February 24, 1989.
 
 
 11
 On cross-examination, Waldon admitted that after his arrest he never told any law enforcement officials the version of these events to which he testified at trial.
 
 II.
 
 12
 When the issue is the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Reviewing the evidence in the light most favorable to the government means that we must make all credibility choices and inferences in a manner which supports the jury's verdict.
 
 
 13
 There is no doubt that Waldon presented substantial evidence in his behalf, which, if believed, certainly would have justified an acquittal. However, the jury chose to credit the testimony of Detective Campbell, and that evidence, standing alone, was sufficient for conviction.
 
 III.
 
 14
 In closing argument, defense counsel made the following statement:
 
 
 15
 Ladies and gentlemen, if you can figure this out tell me why a lady who had her house broken into on February the 24, 1989, who was startled out of her wits, someone breaks in. Yet, you come in and you testify for the ... "alleged burglar" or the attempted rapist or the person who has run into your house on that day. I ask you again to use your common sense, ladies and gentlemen. If that were the case, do you expect Marilyn Miller to come down here and testify on behalf of this particular person?
 
 
 16
 (Appellee's Brief at 17).
 
 
 17
 In the government's rebuttal, the prosecutor responded:
 
 
 18
 Now, again, you saw Marilyn Miller on that witness stand. I tried to ask her one question three or four times, and I still don't get an answer from her. You saw her become confused when defense counsel was asking her questions. And I don't mean to be nasty or derogative when I say that she is not the smartest person in the world. I say that as a simple fact that you could observe, and you could surmise.
 
 
 19
 Now, I think any of you in any situation if people are busting through your doors, and the police are coming in afterwards with guns drawn, you are going to be nervous, upset, you are not going to be thinking in your most calm and dispassionate form or fashion. So I submit to you that what Marilyn Miller told Detective Campbell, according to what Detective Campbell testified to, was in fact what she said. At that point in time she was not with the program. Five months later now she knows what to say.
 
 
 20
 And I ask you again just think about these things. Marilyn Miller she's 21. She's on welfare. She has two children age two months and one year, something to that effect. And she has a fella in college who is coming to see her. Is the defendant her meal ticket out?
 
 
 21
 MR. MACK: Objection, your Honor.
 
 
 22
 THE COURT: Overruled.
 
 
 23
 (App. 103-04; Tr. 263-64).
 
 
 24
 It strikes us that the prosecutor made a fair response to defense counsel's argument. In Angel v. Overberg, 682 F.2d 605 (6th Cir.1982), we stated:
 
 
 25
 The prosecutor is ordinarily entitled to wide latitude in rebuttal argument and may fairly respond to arguments made by defense counsel.... [T]he prosecutor's statements must be so egregious as to render the trial fundamentally unfair. This determination is to be made by evaluating the totality of the circumstances surrounding each individual case....
 
 
 26
 Id. at 607-08 (citations omitted).
 
 
 27
 Credibility was the issue in this case, and the prosecutor would have been remiss if the credibility of Marilyn Miller was not addressed in closing argument. A prosecutor can argue inferences that reasonably could be drawn from the evidence in the case. Even if the prosecutor had not been responding to defense counsel's arguments, we see nothing unfairly prejudicial in the statements made.
 
 
 28
 AFFIRMED.